## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LAWRENCE LESSER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 16-11445 |
| XURA, INC., HENRY R. NOTHHAFT, | ) | |
| SUSAN D. BOWICK, JAMES BUDGE, | ) | JURY TRIAL DEMANDED |
| NICCOLO DE MASI, MATTHEW A. | ) | |
| DRAPKIN, DORON INBAR, PHILIPPE | ) | |
| TARTAVULL, MARK C. TERRELL, SIRIS | ) | |
| CAPITAL GROUP, LLC, SIERRA | ) | |
| PRIVATE HOLDINGS II LTD., and | ) | |
| SIERRA PRIVATE MERGER SUB INC., | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR VIOLATION OF SECTIONS 14(A) AND 20(A)
## OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges

upon personal knowledge with respect to himself, and upon information and belief based upon,

*inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.    This action stems from a proposed transaction announced on May 23, 2016 (the

"Proposed Transaction"), pursuant to which Xura, Inc. ("Xura" or the "Company") will be

acquired by Sierra Private Holdings II Ltd. ("Parent") through its wholly-owned subsidiary,

Sierra Private Merger Sub Inc. ("Merger Sub"), which are affiliates of Siris Capital Group, LLC

(together with Parent and Merger Sub, "Siris").

2.    On May 23, 2016, Xura's Board of Directors (the "Board" or "Individual

Defendants") caused Xura to enter into an agreement and plan of merger (the "Merger

Agreement").  Pursuant to the terms of the Merger Agreement, stockholders of Xura will receive

$25.00 per share in cash.

3.      On June 28, 2016, defendants issued materially incomplete and misleading disclosures in the Preliminary Proxy Statement (the "Proxy") filed with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction. The Proxy is deficient and misleading in that it fails to provide adequate disclosure of all material information related to the Proposed Transaction.

4.      Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Proxy.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6.      This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8.      Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Xura common stock.

9.      Defendant Xura is a Delaware corporation and maintains its principal executive offices at 200 Quannapowitt Parkway, Wakefield, MA 01880.  The Company is a technology

company that offers a portfolio of digital services that enable global communications across a variety of mobile devices and platforms.  Xura's common stock is traded on the NasdaqGM under the ticker symbol "MESG."

10.     Defendant Henry R. Nothhaft ("Nothhaft") is a director of Xura and has served as Chairman of the Board since October 2012.  According to the Company's website, Nothhaft is Chair of the Corporate Governance and Nominating Committee.

11.     Defendant Susan D. Bowick ("Bowick") has served as a director of Xura since October 2012.  According to the Company's website, Bowick is Chair of the Compensation and Leadership Committee and a member of the Corporate Governance and Nominating Committee.

12.     Defendant James Budge ("Budge") has served as a director of Xura since October 2012.  According to the Company's website, Budge is a member of the Audit Committee and the Compensation and Leadership Committee.

13.     Defendant Niccolo de Masi ("de Masi") is a director of Xura.  According to the Company's website, de Masi is a member of the Audit Committee and the Corporate Governance and Nominating Committee.

14.     Defendant Matthew A. Drapkin ("Drapkin") is a director of Xura.  According to the Company's website, Drapkin is a member of the Compensation and Leadership Committee.

15.     Defendant Doron Inbar ("Inbar") has served as a director of Xura since October 2012.  According to the Company's website, Inbar is a member of the Audit Committee and the Corporate Governance and Nominating Commitee.

16.      Defendant Philippe Tartavull ("Tartavull") has served as a director, President, and Chief Executive Officer ("CEO") of Xura since May 2012.

17.     Defendant Mark C. Terrell ("Terrell") has served as a director of Xura since October 2012.  According to the Company's website, Terrell is Chair of the Audit Committee and a member of the Compensation and Leadership Committee.

18.     The defendants identified in paragraphs 10 through 17 are collectively referred to herein as the "Individual Defendants."

19.     Defendant Parent is a private limited company incorporated under the laws of England and Wales.

20.     Defendant Merger Sub is a Delaware corporation and a wholly-owned subsidiary of Parent.

21.     Defendant Siris Capital Group, LLC is a private equity firm that focuses on making control investments in data, telecommunications, technology, and technology-enabled business service companies.

## CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this action as a class action on behalf of himself and the other public stockholders of Xura (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

23.     This action is properly maintainable as a class action.

24.     The Class is so numerous that joinder of all members is impracticable.  As of May 31, 2016, there were approximately 26,190,837 shares of Xura common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

25.     Questions of law and fact are common to the Class, including, among others: (i) whether defendants violated the 1934 Act; and (ii) whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

26.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class.  Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

27.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

28.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

### *Background of the Company*

29.      Xura offers a portfolio of digital services solutions that enable global communications across a variety of mobile devices and platforms.

30.     The Company helps communication service providers ("CSPs") and enterprises navigate and monetize the digital ecosystem to create innovative, new experiences through the Company's cloud-based offerings.

31.     Xura's solutions touch more than three billion people through over 350 service providers and enterprises in more than 140 countries.

32.     On March 18, 2016, the Company announced that TMC, a global, integrated media company that helps clients build communities in print, in person, and online, named Xura's forge SDK as a 2016 WebRTC Product of the Year Award winner.  Rich Tehrani, CEO of TMC, stated, "It gives me great pleasure to honour Xura as a 2016 recipient of the WebRTC Product of the Year Award for their innovative  WebRTC product, in the forge DDK**[.]** Our judges were very impressed with the ingenuity and excellence displayed by XURA in their ground-breaking development work."

33.     With respect to this achievement, Eric Bilange, Executive Vice President Innovation at Xura, commented:

> Last year was a big year for us in terms of enhancing our WebRTC technology and gaining customers in the financial services sector, and we're excited that our hard work is paying off with this award.  Looking forward, we hope to see our product updates and use-cases being realized in 2016 and beyond as more and business see the benefit of rich WebRTC-based communications[.] This is just the start of an upward curve and we are ready for what the future holds.

34.     On April 15, 2016, the Company issued a press release wherein it reported its unaudited fourth quarter and year end 2015 financial results.  Xura reported that total revenue for the three months ended January 31, 2016 was $82 million, compared to $64 million for the three months ended January 31, 2015.  Adjusted EBITDA for the three months ended January 31, 2016 was $14 million, compared to $4 million for the three months ended January 31, 2015.

35.     Total revenue for the fiscal year ended January 31, 2016 was $271 million, compared to $269 million for the fiscal year ended January 31, 2015.  Adjusted EBITDA for the fiscal year ended January 31, 2016 was $13 million, compared to ($23) million for the fiscal year ended January 31, 2015.

***Background of the Proposed Transaction***

36.     According to the Proxy, in October 2013, Individual Defendant Tartavull "first had contact with representatives of Siris regarding a potential transaction, and a confidentiality agreement with Siris was executed."  The Proxy fails to disclose whether the confidentiality agreement contained standstill and/or "don't ask, don't waive" ("DADW") provisions.

37.     On January 7, 2015, Siris submitted an indication of interest to acquire the Company for $24.00 per share.

38.     During January and February 2015, the Company held due diligence sessions with Siris regarding the sale of the entire Company, and with Amdocs Limited ("Amdocs") and a third bidder for the sale of the Company's BSS Business.

39.     In February 2015, Siris changed its offer price to $20.00 to $22.00 per share.

40.     On April 29, 2015, Xura announced that it reached an agreement to sell substantially all of its BSS Business to Amdocs for $272 million in cash.  The transaction with Amdocs closed in July 2015.

41.     In October 2015, the Company announced and completed its global strategic partnership with Tech Mahindra, which specializes in digital transformation, consulting, and business re-engineering in the global technology industry, and its acquisition of Acision Limited, which specializes in secure mobile messaging and engagement services.

42.     On October 19, 2015, Siris submitted an indication of interest to acquire the Company at a price of $30.00 to $32.50 per share.

43.     On October 22, 2015, the Board met and determined to reject Siris's proposal, *despite the fact that it was as high as $7.50 per share greater than the ultimate Proposed Transaction consideration*.

7

44.     On October 29, 2015, Siris submitted an indication of interest to acquire the Company for $35.00 per share, *$10.00 per share greater* than the Proposed Transaction consideration.

45.     On November 5, 2015, the Board decided to engage Goldman, Sachs & Co. ("Goldman Sachs") as the Company's financial advisor, noting that Goldman Sachs has substantial experience "in acting as an advisor for the Company."  The Proxy is silent, however, with respect to the process that the Board undertook to retain Goldman Sachs or consider other potential financial advisors.

46.     On December 3, 2015, the Board established a "Strategic Committee" comprised of Individual Defendants Nothhaft, Tartavull, and Drapkin.  The Proxy does not disclose the reasons behind the creation of the Strategic Committee – such as potential conflicts – other than that it was formed for "convenience purposes."

47.     On January 27, 2016, Goldman Sachs reached out to several potential bidders, and four executed non-disclosure agreements.  The Proxy fails to disclose whether the non-disclosure agreements contained standstill and/or DADW provisions.

48.     On February 8, 2016, a potential strategic buyer ("Party A") expressed interest in exploring the possibility of acquiring the Company's enterprise portfolio.  Nevertheless, for reasons unexplained in the Proxy, the Company determined not to engage in discussions regarding the sale of the Company's enterprise portfolio at that time.

49.     On February 25, 2016, Siris submitted a revised indication of interest to acquire the Company for $28.00 per share.

50.     On March 13, 2016, a potential buyer ("Party B") provided Goldman Sachs with an indication of interest in the range of $26.00 to $27.00 per share.

51.     Two days later, the Board determined to enter into an exclusivity agreement with Siris, which the parties executed on March 16.  The Board also determined to formally engage Goldman Sachs as the Company's financial advisor.

52.     On March 25, 2016, representatives of the Company and Siris discussed "corporate governance matters."  The Proxy does not disclose what these matters entailed. Specifically, the Proxy contains no information as to whether these discussions related to post-closing employment for Company insiders or, perhaps, board positions in the combined company for Xura directors.

53.     In March and April 2016, Siris indicated that it might not be able to offer more than $24.00 per share.  Nevertheless, the Board continued to negotiate exclusively with Siris.

54.     On April 9, 2016, Siris submitted an indication of interest to acquire Xura for $24.75 per share.  In response, Xura's representatives requested that Siris raise its offer price to only $25.00 per share, which Siris readily did.  Notably, the Proxy does not disclose what steps the Board or its advisors took, if any, to determine that the $25.00 per share counteroffer was fair to the Company's stockholders from a financial point of view.  In fact, the Proxy reflects that no such steps may have been taken to reach such a conclusion.

55.     On May 22, 2016, the Board approved the Proposed Transaction with Siris, and the Merger Agreement was executed the following day.

56.     Xura subsequently received requests for information from three parties, which entered into confidentiality agreements.  The Proxy fails to disclose whether those confidentiality agreements contain standstill and/or DADW provisions.

### The Merger Agreement

57.     On May 23, 2016, the Board caused the Company to enter into the Merger Agreement, pursuant to which Xura will be acquired by Siris for inadequate consideration.

58.     Despite a limited and inadequate go-shop period, the Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals.  Section 4.5(c) of the Merger Agreement states:

> (c) Except as may relate to any Excluded Party (for so long as such Person or group is an Excluded Party, and except with respect to clauses (iv) and (v) below) or as expressly permitted by this Section 4.5, from the No-Shop Period Start Date continuing until the earlier to occur of the termination of this Agreement pursuant to Section 6.1 and the receipt of the Company Stockholder Approval, the Company and the Company Subsidiaries shall not, and the Company shall cause its and the Company Subsidiaries' Representatives not to, directly or indirectly, (i) solicit, initiate, cause or induce the making, submission or announcement of, or knowingly encourage, facilitate or assist, an Acquisition Proposal, (ii) furnish to any Person (other than Parent, Merger Sub or any designees of Parent or Merger Sub) any non-public information relating to the Company or any of the Company Subsidiaries, or afford to any Person (other than Parent, Merger Sub or any designees of Parent or Parent) access to the business, properties, assets, books, records or other non-public information, or to any personnel, of the Company or any of the Company Subsidiaries, in any such case with the intent to induce the making, submission or announcement of, or the intent to encourage, facilitate or assist, an Acquisition Proposal or any inquiries or the making of any proposal that would reasonably be expected to constitute an Acquisition Proposal, (iii) participate or engage in discussions or negotiations with any Person with respect to an Acquisition Proposal, (iv) amend, modify or grant any waiver or release under, any standstill, confidentiality or similar agreement of the Company or any Company Subsidiary or (v) enter into any Contract contemplating or otherwise relating to an Acquisition Transaction (other than an Acceptable Confidentiality Agreement).

59.     Notably, Section 4.5(c) of the Merger Agreement prohibits the Company from "amend[ing], modify[ing] or grant[ing] any waiver or release under, any standstill, confidentiality or similar agreement of the Company or any Company Subsidiary[.]"

60.     Further, the Company must promptly advise Siris of any proposals or inquiries received from other parties, including, *inter alia*, the material terms and conditions of the proposal and the identity of the party making the proposal.  Section 4.5(e) of the Merger Agreement states:

> (e) The Company shall promptly advise Parent in writing, in no event later than forty-eight (48) hours after receipt of any Acquisition Proposal and shall indicate the identity of the Person making such Acquisition Proposal and the material terms and conditions of any proposal or offer or the nature of any inquiries or contacts, and thereafter shall keep Parent reasonably informed of all material developments affecting the status and the material terms of any such Acquisition Proposal.

61.     Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants Siris a "matching right" with respect to any "Superior Proposal" made to the Company.  Section 4.5 of the Merger Agreement provides, in relevant part:

> (f) The Company Board shall not: (A) fail to make, withhold, withdraw, amend, qualify or modify in a manner adverse to Parent, or publicly propose to withhold, withdraw, amend, qualify or modify in a manner adverse to Parent, the Company Board Recommendation (including any failure to include the Company Board Recommendation in the Proxy Statement, when mailed); (B) adopt, approve, recommend, endorse or otherwise declare advisable (or make any public announcement of its decision to adopt, approve, recommend or otherwise declare advisable) the adoption of any Acquisition Proposal; (C) recommend, adopt, approve, or declare advisable, or propose to recommend, adopt, approve or declare advisable, or allow the Company or any of the Company Subsidiaries to execute or enter into, any Company Acquisition Agreement (other than an Acceptable Confidentiality Agreement); (D) enter into any agreement, letter of intent, or agreement in principle requiring the Company to abandon, terminate or fail to consummate the transactions contemplated hereby or breach its obligations

hereunder; (E) subject to Section 4.5(h), fail to recommend against any Acquisition Proposal within ten (10) Business Days after the commencement of such Acquisition Proposal; or (F) fail to include the Company Board Recommendation in the Proxy Statement or reaffirm such Company Board Recommendation at the request of Parent within five (5) Business Days (each being referred to as a "Change in Company Board Recommendation"). Notwithstanding the foregoing, the Company Board may, at any time prior to the receipt of the Company Stockholder Approval, take any of the actions set forth in Section 4.5(f)(i)-(iii) below; provided, however, that prior to taking any such action, the Company complies with Section 4.5(g) of this Agreement:

(i) effect a Change in Company Board Recommendation in response to a material fact, event, change or development that (a) arises after the date hereof and was not known to the Company Board as of or prior to the date hereof and (b) does not involve or relate to an Acquisition Proposal, if the Company Board concludes in good faith, after consultation with outside counsel, that the failure to take such action would be inconsistent with its fiduciary duties under applicable Law;

(ii) effect a Change in Company Board Recommendation in response to an Acquisition Proposal if the Company Board concludes in good faith, after consultation with outside counsel, that the failure to take such action would be inconsistent with its fiduciary duties under applicable Law and the Company Board concludes in good faith, after consultation with the Company's financial advisor, that the Acquisition Proposal constitutes a Superior Proposal; and

(iii) terminate this Agreement pursuant to Section 6.1(d)(iii) (and, if applicable, enter into a Company Acquisition Agreement), if the Company receives an Acquisition Proposal that the Company Board concludes in good faith, after consultation with the Company's financial advisor, constitutes a Superior Proposal and the Company Board concludes in good faith, after consultation with outside counsel, that the failure to enter into such definitive agreement would be inconsistent with its fiduciary duties under applicable Law.

(g) Notwithstanding anything to the contrary set forth in Section 4.5(f), the Company shall not be entitled to: (i) make a Change in Company Board Recommendation pursuant to Section 4.5(f)(i) or Section 4.5(f)(ii); or (ii) terminate this Agreement (and, if applicable, enter into any Company Acquisition Agreement) pursuant to Section 4.5(f)(iii), unless in all such instances: (A) the Company shall have first provided prior written notice to Parent that it is prepared to (x) make a Change in Company Board Recommendation (a "Recommendation Change Notice"), or (y) terminate this Agreement pursuant to Section 6.1(d)(iii) in response to a Superior Proposal (a "Superior Proposal Notice"), which notice shall, if the basis for the proposed action by the Company Board is not related to a Superior Proposal, contain a description of the events, facts and circumstances giving rise to such proposed action or, if the basis for the proposed action by the Company Board is a Superior Proposal, contain a

description of the material terms and conditions of such Superior Proposal, including a copy of the Company Acquisition Agreement in the form to be entered into (it being understood and agreed that the delivery of such notice shall not, in and of itself, be deemed to be a Change in Company Board Recommendation); and (B) Parent does not make, within three (3) Business Days after the receipt of such notice, a binding proposal that would, in the good-faith judgment of the Company Board (after consultation with outside counsel and, in the case of a Superior Proposal, the Company's financial advisor), cause such events, facts and circumstances to no longer form the basis for the Company Board to effect a Change in Company Board Recommendation or cause the offer previously constituting a Superior Proposal to no longer constitute a Superior Proposal, as the case may be; provided that during this three (3) Business Day period the Company and its representatives shall, to the extent Parent desires to negotiate, negotiate in good faith with Parent and its representatives. Any material changes with respect to events, facts and circumstances mentioned above, or material changes to the financial terms of such Superior Proposal, as the case may be, occurring prior to the Company's effecting a Change in Company Board Recommendation or terminating this Agreement pursuant to Section 6.1(d)(iii) shall require the Company to provide to Parent a new Recommendation Change Notice or Superior Proposal Notice and a new three (3) Business Day period.

62.     Further locking up control of the Company in favor of Siris is Section 6.3 of the Merger Agreement, which contains a provision for a "termination fee" of up to $22.49 million, payable by the Company to Siris if the Individual Defendants cause the Company to terminate the Merger Agreement.

63.     By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

64.     The Proposed Transaction consideration is inadequate.  Among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

65.     Additionally, Goldman Sachs' own analyses confirm the inadequacy of the merger consideration.  For example, Goldman Sachs' *Selected Transactions Analysis* yielded implied equity values per outstanding share of Company common stock as high as $31.54.

66.     The Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's business, and future growth in profits and earnings.

### The Materially Incomplete and Misleading Proxy

67.     Defendants filed the Proxy with the SEC in connection with the Proposed Transaction.  As alleged below and elsewhere herein, the Proxy omits material information that must be disclosed to Xura's stockholders to enable them to render an informed decision with respect to the Proposed Transaction.

68.     The Proxy omits material information with respect to the process and events leading up to the Proposed Transaction, as well as the opinions and analyses of Xura's financial advisor.  This omitted information, if disclosed, would significantly alter the total mix of information available to Xura's stockholders.

69.     For example, with respect to Goldman Sachs' *Illustrative Discounted Cash Flow Analysis*, the Proxy fails to disclose: (i) the underlying projections and resulting estimates of unlevered free cash flow for the Company for the fiscal years 2016 through 2020 and the terminal year; (ii) the range of illustrative terminal values for the Company; (iii) the inputs and assumptions underlying the weighted average cost of capital analyses; (iv) Goldman Sachs' basis for using perpetuity growth rates ranging from 1.5% to 2.5%; and (v) the methodologies, inputs and assumptions used by Goldman Sachs to determine the present values of the tax liabilities and tax assets.

70.     With respect to Goldman Sachs' *Selected Companies Analysis*, the Proxy fails to disclose the individually observed metrics and multiples for each of the selected companies used

by Goldman Sachs in its analysis, as well as the range of implied values per outstanding share of Company common stock resulting from the analysis.

71.     With respect to Goldman Sachs' *Selected Transactions Analysis*, the Proxy fails to disclose the individually observed EV/LTM multiples for each of the selected transactions used by Goldman Sachs in its analysis.

72.     With respect to Goldman Sachs' *Illustrative Present Value of Future Share Price Analysis*, the Proxy fails to disclose the projections of EBITDA to which the selected multiples were applied, as well as the projections of debt and cash used to derive the future equity value of the Company, which was subsequently discounted, for each of the years included in this analysis.

73.     The Proxy fails to disclose the timing and nature of all communications regarding future employment or directorship of Xura's officers and directors, including who participated in all such communications.

74.     The Proxy fails to disclose the amount of compensation Goldman Sachs has received for past services provided to Xura, Siris, and their affiliates in the last two years.

75.     The Proxy indicates that, pursuant to the terms of Goldman Sachs' engagement letter, the Company has agreed to pay Goldman Sachs a transaction fee of approximately $8.0 million, "which amount may be increased by up to approximately $1.5 million by the Company in its sole discretion[.]"  The Proxy fails to disclose the circumstances under which the Company will pay Goldman Sachs this additional, substantial $1.5 million fee.

76.     Defendants also failed to disclose the results of the go-shop period.

## COUNT I

**Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and Xura**

77.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

78.     The Individual Defendants disseminated the false and misleading Proxy, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading.  Xura is liable as the issuer of these statements.

79.     The Proxy was prepared, reviewed, and/or disseminated by the Individual Defendants.  By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy.

80.     The Individual Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

81.     The omissions and false and misleading statements in the Proxy are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy and in other information reasonably available to stockholders.

82.     The Proxy is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

83.     By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

84.     Because of the false and misleading statements in the Proxy, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

### Claim for Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants and Siris

85.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

86.     The Individual Defendants and Siris acted as controlling persons of Xura within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of Xura and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

87.     Each of the Individual Defendants and Siris was provided with or had unlimited access to copies of the Proxy alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

88.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.  The Proxy contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.  They were thus directly in the making of the Proxy.

89.     Siris also had direct supervisory control over the composition of the Proxy and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy.

17

90.     By virtue of the foregoing, the Individual Defendants and Siris violated Section 20(a) of the 1934 Act.

91.     As set forth above, the Individual Defendants and Siris had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act.  As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A.     Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.     In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.     Directing the Individual Defendants to disseminate a Proxy that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.     Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E.     Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: July 11, 2016

**MATORIN LAW OFFICE, LLC**

By:   */s/ Mitchell J. Matorin*
      Mitchell J. Matorin (BBO# 649304)
      18 Grove Street, Suite 5
      Wellesley, MA 02482
      (781) 453-0100

      *Attorneys for Plaintiff*

**OF COUNSEL:**

**RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky
Brian D. Long
Gina M. Serra
Jeremy J. Riley
2 Righter Parkway, Suite 120
Wilmington, DE 19803
(302) 295-5310